**AMERICAN COMPUTER INNOVATORS, INC.,**
Plaintiff,

v.

**ELECTRONIC DATA SYSTEMS CORP., Defendant.**

No. Civ.A. 95–30202–MAP.

United States District Court,
D. Massachusetts.

Nov. 8, 1999.

---

Harry L. Miles, Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, MA, Mark C. Hansen, David E. Ross, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for American Computer Innovators, Inc., plaintiff.

Thomas Lesser, Lesser, Newman, Souweine & Nasser, Northampton, MA, Daniel Parker, Electronic Data Systems Corporation, Litigation Department, Herndon, VA, Electronic Data Systems Corporation, defendant.

## MEMORANDUM REGARDING EXPERT TESTIMONY

PONSOR, District Judge.

American Computer Innovators, Inc. ("ACI") has sued Electronic Data Systems Corporation ("EDS"), charging EDS with breach of contract, misappropriation of certain confidential information and fraudulent inducement. This memorandum will address the limited issue of whether plaintiff will be permitted to offer certain expert testimony at trial. A brief summary of the underlying facts will suffice to focus the discussion.

According to plaintiff, prior to August 1994, defendant EDS had contracted with a third party, Dow Jones, to replace its "copy-flow" system. This planned data processing system, designated by Dow Jones as its Global News Management System ("GNMS"), would track and control editorial copy from the reporter's notes to the eventual news story as it would appear in the *Wall Street Journal.* One of the products being considered for use in the GNMS was "DewarView," a pre-existing software system that EDS hoped to modify for Dow Jones.

By August 1994 EDS was encountering serious problems in developing a system that met the Dow Jones' specifications. According to plaintiff, EDS then entered into discussions with ACI to obtain ACI's assistance in evaluating and revising the DewarView product. Within a few weeks ACI advised EDS that DewarView would not suit its needs, but that ACI could identify another product, or group of products, that would allow EDS to develop the GNMS.

On October 6, 1994, ACI and EDS signed a Letter of Agreement with the understanding, according to plaintiff, that the parties would enter into a formal contract thereafter. The letter stated that, with certain limitations, any disclosures made by ACI constituted ACI's intellectual property, that ACI would be paid at a rate to be negotiated if Dow Jones used its copy flow solution, and that ACI and EDS would share in the discoveries made during the implementation process. In addition, EDS agreed to keep the ACI solutions confidential, and to allow ACI to publish press releases and make other public statements regarding the importance of ACI's contribution to the GNMS

project "subject to approval by Dow Jones." *See,* Ex. A to Defendant's Memorandum in Support of Reconsideration, Dkt. No. 110.

In the following weeks ACI says it disclosed certain confidential information to EDS that provided a solution to the difficulties EDS had been encountering in developing the GNMS for Dow Jones. Plaintiff claims that EDS, having obtained the information it wanted, began stalling and, in the end, refused to enter into a formal contract with ACI on the terms contemplated by the parties' original discussions and the letter of intent. For its part, EDS contends that Dow Jones simply lost confidence in the kind of products ACI was proposing for the GNMS—its "solution" solved nothing—with the result that there was no point in continuing down the path ACI had marked out. Whatever the reason, on January 12, 1995, a little over three months after the letter of agreement was signed, EDS terminated its working relationship with ACI. It is apparently undisputed that in the years since ACI initiated this lawsuit, EDS has, in fact, *never* been able to develop a copy-flow system satisfactory to Dow Jones; recently Dow Jones has scrapped the entire GNMS project with a loss of several million dollars.

EDS contends that none of the disclosures made by ACI constituted or contained anything that might be considered legally protected confidential information. Moreover, EDS vigorously denies breaching any contract with ACI, misappropriating any confidential information or fraudulently inducing ACI into making any disclosures. Finally, and most significantly for purposes of this memorandum, EDS contends that ACI suffered no significant damages, because any obligation to license ACI's proposed solution, or make any payments to ACI, was conditioned upon the use of ACI's solution by EDS's customer, Dow Jones—a use which has never occurred and, it now appears, will never occur.

During the latter stages of discovery, plaintiff identified several technical and damage experts, proposing to offer them to show that EDS did misappropriate its intellectual property and that ACI suffered damages as a result. Defendant moved *in limine* to exclude all their testimony, and the court denied these motions without prejudice. Defendant thereafter sought a pretrial hearing regarding the admissibility of the experts' testimony, on the authority of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In order to understand this court's approach to the expert issue, it is necessary to look in some detail at *Daubert* and its progeny.

Jason Daubert was a minor child born with serious birth defects, allegedly caused by his mother's ingestion of Bendectin, a prescription antinausea drug marketed by the defendant. The district court granted Dow's Motion for Summary Judgment, holding that the scientific evidence suggesting that Bendectin could cause birth defects lacked sufficient general acceptance in the scientific field. The Court of Appeals for the Ninth Circuit affirmed the grant of summary judgment, citing the rule of "general acceptance" first set forth in *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923), which then governed the evaluation of the admissibility of expert testimony.

The Supreme Court's *Daubert* decision jettisoned the *Frye* test, holding that it was displaced by the adoption of the Federal Rules of Evidence. Under Fed. R.Evid. 702, the central question is whether the expert's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. To evaluate whether an expert's testimony will assist the jury, the trial judge must, first, confirm that the testimony is relevant and, second, make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be

applied to the facts in issue." *Daubert*, at 592–93, 113 S.Ct. 2786. *Daubert* suggests that key questions in making this assessment might include: whether the theory or technique can be tested, whether it has been subjected to peer review and publication, whether the theory or technique exhibits a known or potential rate of error, and whether it is in fact generally accepted. *See Id.*, at 593–94, 113 S.Ct. 2786.

In weighing the admissibility of the proposed expert testimony, the court must keep in mind as well that the inquiry under Rule 702 is flexible. The points of inquiry proposed by Justice Blackmun in *Daubert* are examples only and not intended to limit the tools that might be used by a judge to test the reliability of the proposed testimony. Finally, the judge must be mindful of other rules of evidence that bar opinion based on inadmissible hearsay, and testimony that threatens unfair prejudice to an adversary or confusion to the jury. *Id.*, at 595, 113 S.Ct. 2786.

The Supreme Court elaborated on *Daubert* four years later in *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). There, the Court held that it was proper, to some extent, to examine an expert's conclusions, as well as his/her methodology in determining the threshold admissibility of expert opinion. Thus, as the First Circuit has noted, "while methodology remains the central focus of the *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions." *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir.1998). *Joiner* also established that appellate review of a trial court's rulings on the admissibility of expert testimony should apply an "abuse of discretion" standard. *See Joiner*, at 146, 118 S.Ct. 512.

In its most recent refinement of *Daubert*, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended the trial court's general gatekeeping function from testimony based on "scientific" knowledge (the pertinent area in *Daubert*) to testimony based on "technical" and "other specialized" knowledge. *See* Fed.R.Evid. 702; *Kumho Tire*, at 1171.

Kumho arose from an automobile accident that plaintiffs alleged was caused by a defect in the manufacture or design of a tire. The district court barred the testimony of the plaintiff's witness, an expert in tire failure analysis, applying *Daubert*. The Court of Appeals for the Eleventh Circuit reversed, holding that *Daubert*'s analysis applied "only where an expert relies 'on the application of scientific principles,' rather than 'on skill-or experience-based observation.'" *Kumho Tire*, at 1173, quoting *Carmichael v. Samyang Tire, Inc.*, 131 F.3d 1433, 1435–36 (11th Cir.1997).

The Supreme Court disagreed, holding that *Daubert* applies to all expert testimony offered under Rule 702. *See id.*, at 1175. Regardless of whether the expert might be designated "scientific," "technical" or "other," where the testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.*, at 1175, quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. Justice Breyer emphasized, however, that the judge's gatekeeping function must not invade the province of the jurors, who bear the responsibility to "decide among conflicting views of different experts, even though the evidence is 'shaky.'" *Kumho*, at 1177.

Even with the guidance of the *Daubert*, *Joiner* and *Kumho* triad, "choreographing the *Daubert* pavane remains an exceedingly difficult task." *Ruiz–Troche*, 161 F.3d at 81. In this case, the rather eccentric underlying facts make the task more nettlesome than usual. Since this case involves technical or other expertise, not scientific, and since the testimony is based

mainly on personal experience and knowledge, rather than scientific methodology, the court must shoulder the task, noted by Judge Gertner in *United States v. Hines,* 55 F.Supp.2d 62 (D.Mass.1999), of interpreting the Supreme Court's "mixed message: [a]pply *Daubert* to technical fields, even though the scientific method may not really fit, but be flexible." *Id.,* at 67.

The dilemma facing plaintiff that has generated the *Daubert* inquiry in this case may be easily summarized. At trial, plaintiff will bear the unwieldy burden of persuading a jury that it is entitled to damages arising from a relatively short association with defendant, generated by work intended to assist a third party who ultimately declined the assistance, in connection with a project that has now apparently been entirely abandoned. Evidence of some aspects of the damage claim (assuming liability can be shown) may be relatively easy to offer, such as the value of work ACI actually performed that EDS allegedly promised to pay for.

But there is a vastly larger kind of damage claim pressed by plaintiff for which it seeks damages, and about which expert testimony will probably be essential. Plaintiff contends that, had defendant not wrongfully terminated its contract with plaintiff, plaintiff would have been able to make known to its other customers that it was associated with Dow Jones in the effort to develop the new copy-flow system for the *Wall Street Journal.* Dow Jones would have become what is called in the argot of the trade a "reference site" for ACI, *i.e.,* an impressive detail on its corporate resume. According to plaintiff, the commercial cachet resulting from this association would have been so striking to third-party potential customers of ACI that ACI's business would have developed exponentially faster, with more than $150 million in additional profits, had its contract with EDS not been wrongfully breached.

■ From this pretrial perspective, this argument looks like a tough sell, especially since ACI would only have been permitted to announce publicly its involvement in the GNMS project with the approval of Dow Jones. To carry its burden, plaintiff proposed to offer the testimony of Larry E. Justice, an investment consultant with extensive experience regarding precisely the sort of intellectual property at issue here—*i.e.,* copy flow systems used by news organizations—and the companies developing them. According to plaintiff, Justice would "give an opinion about the nature and size of the market open to ACI had it developed the Dow Jones copy-flow component with EDS." Joint Pretrial Memorandum, Dkt. No. 72, at 14.

On April 28, 1999, Justice appeared before this court for a *Daubert* hearing. During the hearing and in the post-hearing memorandum, defendant's objections to Justice's testimony boiled down to two. First, as noted, no evidence suggests that Dow Jones *would,* in fact, ever have given its "approval" of any public statement about ACI's involvement in developing the GNMS, particularly in view of Dow Jones' prompt, flat rejection of the suggested solutions offered by ACI by early 1995. Second, even assuming that ACI could somehow have publicly exploited its involvement in the GNMS project (which in view of the disastrous outcome now appears equivalent to bragging that your company drew up the designs for the Edsel), EDS contends that Justice's estimates of gargantuan lost profits are purely speculative and lack any rational basis. This court agrees with the first objection, but disagrees with the second.

A sufficient factual predicate will have to be established at trial regarding ACI's ability to tout publicly its association with the GNMS project. Unless sufficient evidence is offered at the early stage of the trial to justify a reasonable juror in concluding that, but for EDS' breach, ACI would have enjoyed this associational cachet, Justice will not be permitted to offer his opinion. It is noteworthy that this threshold hurdle does not implicate *Dau-*

*bert,* since the preliminary showing will not involve the expert's reasoning or methodology. This facet of defendant's objection is analogous to an attempt to bar an accident reconstruction expert's testimony on the ground that no evidence will demonstrate that defendant was even in town at the time of the accident. The question is whether the plaintiff even gets to offer the opinion, not whether the expert's methodology is competent.

 If the factual predicate is laid, however, the Justice opinion may be "shaky" but it is admissible. As noted, this expert has in-depth, lengthy, personal experience in the very area in question. He is not analogous to the all-purpose engineer who offers testimony on everything from refrigerators to diapers to airplane engines. His analysis includes comparisons to other companies operating in the general area. While the amounts of damages suggested by him are enormous, nothing in his reasoning or methodology renders his testimony inadmissible.

In sum, when and if this case goes to trial, the court will make its decision regarding the testimony of this witness depending on whether an adequate foundation is laid.

Defendant proposes further *Daubert* hearings with regard to one other expert witness offered by the plaintiff, Dr. Craig Moore, and three technical experts. The court will permit a further *Daubert* hearing for no more than two hours, with regard to the testimony of Dr. Moore. No *Daubert* hearing will be permitted with regard to the technical experts, since the objections offered to these witnesses' testimony appear to be purely based upon the weight to be given to the opinions in view of the factual support for them, and not on threshold questions of reasoning and methodology. The court may, of course, reconsider this decision as facts develop at trial.

The clerk will contact counsel to set a date for a further *Daubert* hearing regarding the testimony of Dr. Moore.

It is So Ordered.