## COMMONWEALTH *VS.* JERMAINE BERRY.

No. 97-P-629.

Suffolk. October 6, 1998. - May 28, 1999.

Present: WARNER, C.J., GREENBERG, & FLANNERY, JJ.[1]

Further appellate review granted, 430 Mass. 1106 (1999).

*Homicide. Practice, Criminal,* Instructions to jury. *Self-Defense. Joint Enterprise. Evidence,* Self-defense, Joint enterprise, Presumptions and burden of proof, Prior misconduct, Relevancy and materiality.

At the trial of an indictment for murder in the second degree, the evidence was sufficient to support the judge's instruction to the jury on voluntary manslaughter on the theories of either heat of passion induced by reasonable provocation or in sudden combat, or the use of excessive force in self-defense [28-31], and the evidence warranted the jury's verdict of guilty of manslaughter either on a theory of joint venture or as a principal [31-32].

At the trial of an indictment for murder in the second degree, the judge's instructions on provocation in the voluntary manslaughter charge and on the Commonwealth's burden of proof created no substantial risk of a miscarriage of justice. [32-34]

At the trial of a criminal case, the judge did not abuse her discretion in permitting a witness to testify that the defendant had previously given the witness's name as his own to police when charged with other crimes, where the judge limited the jury's consideration of the testimony to evaluating the bias and credibility of witnesses, including the defendant's alibi witnesses, who claimed that the first witness had admitted to the crime for which the defendant was being tried. [34-35]

INDICTMENT found and returned in the Superior Court Department on October 17, 1994.

The case was tried before *Barbara J. Rouse, J.*

*Syrie Davis Fried* for the defendant.

*Joseph M. Makalusky*, Assistant District Attorney, for the Commonwealth.

WARNER, C.J. The defendant was indicted for second degree

---

[1]This case was heard by Chief Justice Warner and Justices Greenberg and Flannery. Justice Flannery died before the opinion was written. Justice Smith joined the panel and participated in this decision.

murder in the stabbing death of Hazel Mack. A Superior Court jury convicted him of voluntary manslaughter, either on the theory that he was the stabber or that he was a joint venturer in the killing. The defendant argues on appeal that his conviction should be overturned because (1) the evidence did not warrant giving a voluntary manslaughter instruction, (2) there was insufficient evidence for a conviction on a joint venture theory, (3) the instructions on manslaughter were erroneous, and (4) prejudicial testimony was improperly admitted. We affirm the conviction.

*The Commonwealth's case.* We summarize the evidence presented by the prosecution. At approximately 10 P.M the evening of August 27, 1994, the victim and his brother, Sean Mack, went to the Carter American Legion Post (Post), a social club in the Mattapan section of Boston. The victim had an argument with someone there. Security personnel escorted him out of the club at approximately 1:45 A.M. and would not allow him to return. He was extremely angry. When the Post closed at 2 A.M., the victim gave his blazer, shirt, and telephone to his friend, Rene'e Bailey, in preparation for fighting the person he had argued with earlier inside the Post. However, that person remained inside the club.

As the victim stood on the steps in front of the Post, a group of people, including the defendant, approached from the opposite side of the street. The defendant and the victim exchanged words, and the two attempted to fight. According to Sean, one of the victim's friends, Anton Warren, tried to keep them apart as the defendant kept "charging" at the victim. Another person, whom Sean believed to be a friend of the defendant, approached the defendant and the victim. Sean began fighting with that person. The defendant and the victim continued to try to get at one another. Warren continued trying to prevent them from fighting, but then left the victim's side to aid Sean.

The participants in the fight moved down the street in a group, and a crowd gathered. Rene'e Bailey saw "a lot of people . . . coming out everywhere, closing us in, more or less," and "tussling," and observed the defendant fighting with the victim.[2] A police officer saw close to one hundred people at the scene, and

---

[2]Both Sean and Rene'e Bailey testified that they saw no one except the defendant fighting with the victim.

three or four groups fighting.[3] Bailey heard Warren "tell [the defendant] to put the knife away, that he didn't need it." At that moment, Bailey noticed a shiny object in the defendant's hand. About a minute later, she saw the victim lying on the ground, bleeding, and the defendant throwing his shirt at him and spitting at him.

Police officers had now arrived, and Sean, who had seen his brother on the ground with blood on his shirt, directed them to the defendant, whom they arrested. Upon his arrest, the defendant gave his name as "Barry," rather than Berry. Type A blood, the victim's blood type, was found on the defendant's shorts and sun visor, as well as on a knife found at the scene. The defendant's blood type is AB.

Sean testified that he never saw a knife or other weapon during the fray and did not realize at the time that his brother had been stabbed. However, a police officer testified that Sean, hysterical, had identified the defendant as "one of the two that were involved in the stabbing" and as having a knife. Another officer testified that Sean identified the defendant as "one of the ones that stabbed my brother."

*The defendant's case.* The defendant's witnesses described the following course of events. The defendant, accompanied by his friend Ken McFadden and his cousin Isaac Wilkerson, went to the Post in search of an after-hours party. Testifying in his own defense, the defendant stated that he established eye contact with the victim as he approached the Post, and that the two began to have words. As they insulted and tried to get at one another, each was accompanied by companions who became involved in the fighting.[4]

Someone grabbed at the defendant's shirt, and it came off. The victim hit someone in the eye. The defendant eventually hit the victim. As the victim charged toward him, the defendant ducked, grabbed the victim's lower legs, and swept him off his feet. According to the defendant, spectators became involved in

---

[3]Another officer estimated the crowd at twenty-five to thirty.

[4]The defendant testified that as he and the victim were arguing and beginning to move down the road, he realized that it was "going to be something. It's spread out, you know? And it's not just me and [the victim]. [The victim's] with some individuals; I'm with some individuals."

the fight, and there was fighting in "every direction."[5] He acknowledged that he could have walked away from the fighting at any time.

Wilkerson and McFadden both admitted being involved in the fighting, Wilkerson claiming that he had tried to break up the fight. Both denied being the stabber. McFadden, the only witness who testified to having seen who threw the first punch, stated that the victim initially swung at the defendant and that he, McFadden, then swung at the victim. Noticing the defendant and Wilkerson standing near one another, McFadden tried to get them to leave, but as they were about to go, someone lunged toward McFadden with a beer bottle. That person then gave the bottle to the victim, who hit the defendant in the chest with it.

Anton Warren testified that he never saw the defendant with a knife but, rather, that he had seen a different person, whom he thought was with the defendant, opening and closing a knife. He yelled to that person to put the knife away.[6] According to Warren, the defendant was then within five to seven feet, close enough to hear. After Warren left the victim's side for a moment to help Sean, he turned back to the victim. He saw him fall to the ground and saw the defendant throw his shirt at him and then spit at him. The person with the knife was gone.

Wilkerson testified that the defendant had been the last to fight with the victim before he fell. The defendant acknowledged that he had been the last to have contact with the victim and that he had thrown his shirt at him. He testified that when the fighting died down at the sound of police sirens, he began to look for his shirt and visor. He found his shirt on the ground, soiled and torn, then turned back toward the victim and saw him falling. Angry at the damage to his shirt, he threw it at the victim, but did not spit at him. He denied having stabbed the victim, or having had a weapon, or knowing that anyone in the vicinity had a knife, or hearing Warren say "put the knife away."

---

[5]Wilkerson also testified that there was a large crowd, that it was "getting out of hand," and that other fights were going on.

[6]Warren stated initially that he did not know whether the person with the knife was a friend of the defendant, but he later testified that he "felt like he was a threat. . . . I'm sure he wasn't going to stab [the defendant] because that's his friend." He further testified that the person with the knife had remained near the defendant during the fighting. He identified the knife recovered at the scene as similar to the knife he saw that night.

The defense theory was that Isaac Wilkerson was the stabber, not the defendant. The defendant presented the testimony of four witnesses, friends of his, who stated that Wilkerson came to the apartment where they were gathered after the fight and admitted to stabbing the victim.[7] Wilkerson, who brought a change of clothes to the defendant at the police station after the defendant's arrest, denied having confessed to the slaying. On cross-examination, over the defendant's objection, Wilkerson testified that the defendant had previously given his name as "Wilkerson" when he had been in trouble with the law concerning a weapons charge.

The defendant admitted that he never saw Wilkerson with a knife and that he had told the police that Wilkerson had not stabbed anyone. He further admitted that he had given his name to the police as "Barry" in order to deceive them.

1. *Sufficiency of the evidence of voluntary manslaughter.* The trial judge instructed the jury on voluntary manslaughter based on two theories: (1) that the defendant killed in the heat of passion induced by reasonable provocation or in sudden combat or (2) that the killing resulted from the use of excessive force in self-defense. The defendant contends for the first time on appeal that there was insufficient evidence to support a voluntary manslaughter charge.[8] We conclude that there was sufficient evidence for a manslaughter charge based on either of the two theories.

To support the theory that the defendant killed in the heat of

---

[7]The witnesses did not come forward with this information until two or three weeks before trial, nearly a year after the stabbing. One of them, Ken McFadden, had been involved in the fight that ended in the victim's death. He said that he did not go to the police initially because he feared being implicated and because he thought that Wilkerson would come forward with an admission. The other three witnesses contended that they had refrained from going to the police earlier because they thought that Wilkerson would go to the police on his own.

[8]At trial the defendant objected to a manslaughter charge on the ground that he did not want the jury to arrive at a compromise verdict. See *Commonwealth* v. *Woodward*, 427 Mass. 659, 662-665 (1998) (when the evidence permits a finding of a lesser included offense, a judge must grant the Commonwealth's request for an instruction on the possibility of conviction of the lesser crime). This objection did not preserve for review the argument the defendant makes on appeal. See *Commonwealth* v. *Lapointe*, 402 Mass. 321, 327-328 (1988). Nevertheless, we review the issue because "a verdict cannot stand unless it appears that the jury reached their verdict on a theory for which there was factual support." *Commmonwealth* v. *Plunkett*, 422 Mass. 634, 635 (1996).

passion induced by reasonable provocation or sudden combat, "[t]here must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Curtis,* 417 Mass. 619, 629 (1994), quoting from *Commonwealth* v. *Walden,* 380 Mass. 724, 728 (1980). "A jury instruction on voluntary manslaughter is warranted 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *Masello,* 428 Mass. 446, 449 (1998), quoting from *Commonwealth* v. *Seabrooks,* 425 Mass. 507, 514 (1997).

The jury could have found that the victim struck the first blow, hitting the defendant with his bare hands and then with a bottle. While a blow struck by the victim does not necessarily amount to the provocation required for a heat of passion manslaughter instruction, see *Commonwealth* v. *Curtis,* 417 Mass. at 629 n.6, there was adequate provocation in this case. An apparently senseless argument had escalated from words between the defendant and the aggressively angry victim to a full-scale brawl. A crowd of perhaps one hundred had gathered and was becoming uncontrollable. Several fights had broken out, and people were being attacked from various sides. The jury could have concluded that the defendant feared he would be distracted by the victim's friends or by some other activity in the wild melee and that he lashed out with a knife and stabbed the victim to end the fight. This view of the evidence warranted giving a voluntary manslaughter instruction based on heat of passion induced by sudden combat or reasonable provocation.

Viewed slightly differently, the evidence justified an instruction on the use of excessive force in self-defense. An instruction concerning the law of self-defense is proper if there is "evidence warranting at least a reasonable doubt that the defendant: (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used

no more force than was reasonably necessary in all the circumstances of the case." *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980). See *Commonwealth* v. *Reed,* 427 Mass. 100, 102-103 (1998). "Absent the latter two elements, an instruction on manslaughter because of reasonable provocation or because of the use of excessive force in self-defense may be warranted." *Commonwealth* v. *Harrington, supra.*

The jury could have found that, having struck the first blow, the victim hit the defendant with a bottle just as the defendant was preparing to leave with McFadden and Wilkerson. A large brawl had developed, several fights were going on simultaneously, and people were "closing . . . in." The defendant may have believed that he was trapped after the victim hit him with the bottle and that further attacks with a weapon could come from any direction. Under these circumstances, the jury could have concluded that he reasonably thought he was in imminent danger of death or serious bodily harm from which he could defend himself only by the use of deadly force. See *Commonwealth* v. *Kendrick,* 351 Mass. 203, 210-213 (1966) (victim struck defendant with a fireplace poker before defendant stabbed him; defendant may have been cornered; voluntary manslaughter charge was justified, based on either reasonable provocation negating malice or the use of excessive force in self-defense); *Commonwealth* v. *Boucher,* 403 Mass. 659, 663-664 (1989) (victim, a student of karate, kicked defendant's head; defendant stabbed him; voluntary manslaughter charge was justified, based on either reasonable provocation negating malice or the use of excessive force in self-defense). Contrast *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 746-747 (1975) (victim and defendant had been in a drunken fistfight; they swung at each other, but no blows landed; judge's refusal to give a voluntary manslaughter instruction was not erroneous); *Commonwealth* v. *Curtis,* 417 Mass. at 628-629 (victim attempted to hit defendant, who landed the first blow, with a bottle of liquor; omission of a voluntary manslaughter instruction was not erroneous).

While it was not the defendant's testimony that produced the evidence supporting a voluntary manslaughter charge — he did not mention being hit by a bottle, he denied having been in possession of a knife, seeing anyone with a knife or stabbing the victim, and said that he could have walked away from the fight at any time — so long as other evidence in the case warrants giving the instruction, the defendant's own testimony need not

provide the basis for the charge. See *Commonwealth* v. *Mains*, 374 Mass. 733, 735 (1978).[9]

2. *Sufficiency of the evidence of joint venture.* The case was submitted to the jury on theories of both individual and joint venture culpability. The defendant contends that the evidence was insufficient to convict him as a joint venturer.[10] Because there was a general verdict, we do not know on which theory he was convicted. We conclude, however, that there was no error because the evidence warranted the jury's conclusion that he was guilty either as a joint venturer or as a principal. See *Commonwealth* v. *Souza*, 428 Mass. 478, 488 (1998), citing *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992).

To sustain a conviction of manslaughter by joint venture, the Commonwealth must prove beyond a reasonable doubt that the "defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988), quoting from *Commonwealth* v. *Bianco*, 388 Mass. 358, 366 (1983). Additionally, the Commonwealth must prove that the defendant possessed the mental state required for the crime of manslaughter. *Commonwealth* v. *Cunningham*, 405 Mass. 646, 659 (1989), citing *Commonwealth* v. *Longo*, 402 Mass. at 486-487.

The jury could have found that the defendant, aided by his companions McFadden and Wilkerson, was fighting with the victim when one of the defendant's companions began to open and close a knife. Within the defendant's hearing, Anton Warren

---

[9]The jury could reasonably have disbelieved each of the defendant's assertions noted above, viewing them as part of a strategy to downplay the extent of his involvement in the fight.

[10]The defendant's argument on appeal is based on the misperception that sufficient evidence to support a joint venture verdict must have been presented through the Commonwealth's case-in-chief. We are limited to that evidence when we review to determine whether the defendant's motion for a required finding of not guilty, made at the close of the Commonwealth's case, has been properly denied. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 & n.1 (1976). This is not the focus of our review here. If there was any basis other than joint venture on which the case could have been submitted to the jury, there is no directed verdict issue on appeal. See *Commonwealth* v. *Podlaski*, 377 Mass. 339, 344 & nn.5, 6 (1979). In this case, the sufficiency of the evidence for the defendant's conviction as a principal is not at issue. "Requests for instructions and objections to the judge's charge are the appropriate remedies in such an instance." *Id.* at 344 n.5.

admonished the knife wielder to put the knife away. At this point, the defendant knew that there was a substantial likelihood that his companion would stab the victim, but continued to fight in concert with him, making physical contact with the victim shortly before he fell.

From this evidence, the jury could have inferred that a companion of the defendant stabbed the victim and that the defendant aided in the fatal attack. Although there was no direct evidence that one of the defendant's companions did the stabbing, such evidence "is not required where, as here, there is strong circumstantial evidence that one of the [assailants]" was the stabber. *Commonwealth* v. *Cohen,* 412 Mass. at 381, quoting from *Commonwealth* v. *Casale,* 381 Mass. 167, 174 (1980). See *Commonwealth* v. *Souza,* 428 Mass. at 489. The defendant evinced his agreement to aid in the crime when he continued to fight along with his companion, knowing that he was wielding a knife and might well stab the victim with it. An agreement by joint venturers need not be express, *Commonwealth* v. *Semedo,* 422 Mass. 716, 719 (1996), and cases cited, and can be inferred from the joint participation in the crime. *Commonwealth* v. *Longo,* 402 Mass. at 488. *Commonwealth* v. *Semedo, supra.* "[P]rior planning or agreement" is not required, so long as "the parties consciously acted together in carrying out the criminal endeavor." *Commonwealth* v. *Branch,* 42 Mass. App. Ct. 181, 184 n.3 (1997), quoting from *Commonwealth* v. *Fidler,* 23 Mass. App. Ct. 506, 513 (1987).

The defendant showed his consciousness of guilt when he gave a false name to the police in order to deceive them. See *Commonwealth* v. *Anderson,* 396 Mass. 306, 312 (1985). As discussed in part 1, *supra,* there was evidence from which the jury could have found that the defendant possessed the mental state to support a manslaughter conviction. The evidence was sufficient to prove the defendant guilty of voluntary manslaughter as a joint venturer.[11]

3. *The instructions on manslaughter.* The defendant contends that the judge defined adequate provocation incorrectly in her voluntary manslaughter charge and improperly instructed on the

---

[11]The judge instructed the jury that, in order to be convicted as a joint venturer in the stabbing, the defendant had to know that his companion was armed and that he would or could use the weapon. Thus, there was no danger that the jury convicted the defendant of manslaughter on evidence that he intended only to engage in a fistfight with the victim.

Commonwealth's burden of proof. We view these instructions, to which there was no objection at trial, in the context of the charge as a whole, see *Commonwealth* v. *Torres*, 420 Mass. 479, 489 (1995), to determine whether any error created a· substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). *Commonwealth* v. *Alfonso*, 19 Mass. App. Ct. 599, 606 (1985).

The defendant contends that the trial judge's initial reference to adequate provocation as that which would produce "an abnormal state of mind" was incorrect. The judge went on to describe adequate provocation, as set out in the margin,[12] in a manner perfectly consistent with the definition presented in *Commonwealth* v. *Walden*, 380 Mass. at 728. The instruction correctly conveyed the concept of adequate provocation to the jury.[13]

With regard to the Commonwealth's burden of proof regarding voluntary manslaughter, the judge carefully and correctly instructed that evidence of adequate provocation mitigates murder to manslaughter and that, in order to convict the defendant of murder when evidence of adequate provocation has been presented, the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act under adequate provocation. The judge also carefully instructed on the use of excessive force in self-defense as a basis for a manslaughter conviction, and she explained that the Commonwealth had the burden of proving that the defendant did not act in self-defense. However, the judge did precede these instructions with the erroneous statement that, in order to prove its case of voluntary manslaughter, the Commonwealth had to

---

[12]The judge defined adequate provocation as "that which would likely produce in an ordinary person such a state of passion or anger or fear, fright, or nervous excitement as would obliterate a person's ability to think, to reflect, or to restrain himself. The law requires the provocation which would likely produce in an ordinary person such a state of passion, anger, fright, or fear, and that what happened actually did produce that state of mind in the defendant."

[13]The defendant also takes issue with the instruction that "[i]f a person kills another in the heat of passion which is occasioned by adequate and reasonable provocation or in sudden combat, even though that person has an intent to kill, the killing is designated manslaughter. . . ." This phrasing is perfectly proper and, as the defendant acknowledges, has been adopted in many decisions. See *Commonwealth* v. *Walden*, 380 Mass. at 727; *Commonwealth* v. *Boucher*, 403 Mass. at 662; *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990).

prove that the defendant acted "as a result of either sudden combat or in the heat of passion or using excessive force in self-defense." See *Commonwealth* v. *Torres*, 420 Mass. at 488-489 & n.8. Had this misstatement affected the jury's deliberations, it would have increased the difficulty of arriving at a manslaughter verdict. Since they convicted the defendant of manslaughter, the error created no substantial risk of a miscarriage of justice.

4. *Wilkerson's testimony that the defendant had previously given his name as Isaac Wilkerson when charged with a crime.* Over the defendant's objection, the judge permitted Isaac Wilkerson to testify that the defendant had previously given the police Wilkerson's name instead of his own when he was charged with weapons violations.[14] The judge limited the jury's consideration of this evidence to evaluating the bias and credibility of witnesses, and told them that they could not use evidence that there may have been outstanding warrants against the defendant as evidence of his guilt. The defendant argues that the evidence was irrelevant and prejudicial.

Evidence of the defendant's prior bad acts is not admissible to show his bad character or propensity to commit the crime charged. *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence is admissible to demonstrate the defendant's knowledge, intent, motive, method, or to prove other facts relevant to the crime charged. *Commonwealth* v. *King*, 387 Mass. 464, 469 (1982). *Commonwealth* v. *Brown*, 389 Mass. 382, 384 (1983). It is within the judge's discretion to determine whether the evidence is relevant and whether its probative value outweighs any prejudice to the defendant. *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982), and cases cited. The judge's decision will not be disturbed absent clear error. *Commonwealth* v. *Harvey*, 397 Mass. 351, 359 (1986).

The evidence that the defendant had previously tried to blame Wilkerson for his actions had some bearing on the jury's evaluation of the defense strategy depicting Wilkerson as the perpetrator. Each of the four witnesses who testified that Wilkerson had admitted to the stabbing was a friend of the defendant, and

---

[14]Wilkerson testified that when he went to court for a hearing on a traffic ticket, he learned that there were warrants out for his arrest for possession of a firearm, discharging a firearm and "some type of ammunition." He later learned that the charges had been made against the defendant, who had given Wilkerson's name.

none came forward until shortly before trial. The evidence at issue bore on their credibility, as well as on the credibility of Wilkerson's contention that he had not made the admissions they imputed to him. See *Commonwealth* v. *Redmond*, 357 Mass. 333, 336-338 (1970) (Commonwealth had the right to bring out the relationship between defendant and an alibi witness, even though the evidence indicated that defendant may have committed another crime); *Commonwealth* v. *Blow*, 362 Mass. 196, 201 (1972) ("in borderline cases, [evidence of other offenses is] admissible when its relevance outweighs the undue prejudice that may flow from it, but otherwise [is] inadmissible"). We cannot say that the judge abused her discretion in admitting the evidence.

*Judgment affirmed.*