Smith, J.
INTRODUCTION
In this case, the plaintiffs, Peter W. Holtje and Marcelline G. Holtje (“plaintiffs”), allege that the defendant, William E. Waterman, M.D. (“defendant”), committed medical malpractice by negligently managing the psychiatric medication of their son, Steven Holtje (“Steven”). The plaintiffs have filed two motions in limine in which the plaintiffs seek to exclude certain evidence and expert testimony. The first motion seeks exclusion of any references and expert testimony related to cocaine at trial. The second motion seeks exclusion of any testimony from the defendant’s expert, Brian Pape, Ph.D., that has been inadequately disclosed as well as any testimony that relates to temezapam/oxazepam (TMZ/OXZ) redistribution and ratios.[1]
After an extensive hearing, consideration of the parties’ submissions, and for the reasons set forth below, both of the plaintiffs’ motions in limine are DENIED.

FINDINGS OF FACTS

Based on the parties’ submissions and credible testimony at the Daubert hearing, this Court makes the following findings of fact.
In 1992, the defendant, William E. Waterman, M.D. treated Steven Holtje, the plaintiffs’ son, for panic attacks and clinical depression. As part of this treatment, the defendant provided Steven with a prescription for temazepam (“TMZ”). Later, on August 29, 1992, Steven committed suicide with a gunshot to the head. An autopsy of Steven’s body was conducted on August 30, 1992.
About three and a half months later, on or about December 12, 1992, the Massachusetts Department of State Police Crime Lab performed several toxicology tests on Steven’s blood which had been preserved by freezing. The report indicated a benzoylecgonine (“BE”)[2] level of 65 ug/dl and negative results for alcohol, barbiturates, methamphetamine, and morphine. Supplemental tests for temazepam (“TMZ”) and oxazepam (“OXZ") were conducted on or about March 4, 1993, March 8, 1993, and March 11, 1993. These results indicated a TMZ level of 97 ug/dl and an OXZ level of 31 ug/dl.[3]
In response to the plaintiffs’ motions, this Court held a hearing on September 21, 1999 and on September 22, 1999 during which the parties presented several witnesses and exhibits. Lisa L. vonMoltke, M.D., a pharmacologist, and Marc A. Whaley, M.D., a psychiatrist, testified for the plaintiffs. Brian Pape, Ph.D., a toxicologist, and Bernard Levy, M.D., a psychiatrist, testified for the defendant.
1. Plaintiffs’ Experts
A. Dr. Lisa vonMoltke
The plaintiffs presented Lisa vonMoltke, M.D, a pharmacologist, as their expert regarding the proffered testimony of the defendant’s expert, Dr. Pape, who opined about the doses of cocaine taken by the decedent as well as the time of ingestion. Dr. vonM-oltke provided testimony based upon her educational and professional background and opined that the analysis completed by Dr. Pape as to the time and amount of cocaine Steven used prior to his death is unreliable because it lacks sufficient information to support its conclusions.
Dr. vonMoltke described her qualifications at length as follows. She is a graduate of Wellesley College and the College of Human Medicine at Michigan State University. After graduation, she completed an internship and residency in internal medicine at the New England Medical Center as well as a clinical pharmacology fellowship at Tufts University School of Medicine. Additionally, she is board certified by the American Board of Clinical Pharmacology and is a Diplomat of the American Board of Internal Medicine. Currently, Dr. vonMoltke works as a Research Assistant Professor in the Department of Pharmacology and Experimental Therapeutics at Tufts University School of Medicine and as a Staff Physician in the Department of Medicine at the New England Medical Center. She is also the author of numerous articles on the subject of pharmokinetics, a subject matter that involves analysis of blood levels, metabolic processes, and molecular biology.
The thrust of Dr. vonMoltke’s testimony centered on her opinion that the methodology used to determine the time and amount of cocaine Steven used prior to his death is unreliable because it lacked the necessary information. She contended that utilizing the BE level alone to make timing and dosage determinations pres *90 ents difficulty because false readings of BE levels may result from redistribution, a process in which “concentrations of certain drugs in certain organs (typically the heart, lung, and liver) leach into the blood supply of the body” after death so that “drug concentrations [in the blood) appear artificially high.” She referenced a study that cautioned reliance on metabolite levels at death to determine cocaine dosage amount.[4]
Yet given the potential for false readings of the BE levels at death, Dr. vonMoltke nevertheless acknowledged that by utilizing different scenarios, the quantity of BE can reveal the quantity of cocaine consumed. She explained that factoring in the half-life of BE, along with the route of administration, and the time the cocaine was ingested, a “backward” analysis can be conducted to determine possible amounts of the cocaine used. Dr. vonMoltke asserted that in Steven’s case, this analysis could not be conducted because insufficient information exists regarding the route of administration and the time of ingestion. In her view, the BE level does not give way to any one particular time scenario. Nevertheless, she acknowledged that the BE level does allow the determination that Steven used cocaine sometime within the three days of his suicide.
Additionally, Dr. vonMoltke’s testimony addressed the reliability of determining the effect cocaine had on Steven’s mental state. While acknowledging that cocaine can affect an individual’s mental state, she explained that determining the extent of the impact remains dependent upon the time the cocaine was taken and the route of its administration. She emphasized that because no cocaine amount can be determined, its mental effect on Steven could not be conclusively established.
At the conclusion of her direct testimony, Dr. von-Moltke asserted that Steven’s August 1992 prescription for sixty 30mg pills and thirty 50 mg pills of TMZ[5] authorized by the defendant exceeded a therapeutic dose. As she explained, the standard prescription for TMZ typically involves 15 to 30 mg, with one pill taken per day. Dr. vonMoltke further explained that the toxicology report’s reading of thirty percent of OXZ was particularly high when compared with normal levels that remain virtually undetectable or extremely low. Reported levels at their highest only reach 5%. Given this information, along with the knowledge that OXZ is a metabolite of TMZ that is formed as a result of the body’s metabolism of TMZ, Dr. vonMoltke concluded that such high OXZ levels resulted from Steven’s overdose of TMZ.
During cross-examination, Dr. vonMoltke however agreed that the decomposition of cocaine may result when blood is stored post mortem. She also stated that it is possible that at the time of Steven’s autopsy his blood contained cocaine. Additionally, she acknowledged the possibility that Steven used cocaine on the day of his death.
B. Dr. Marc A. Whaley
The plaintiffs also presented Dr. Marc A. Whaley, a psychiatrist to provide expert testimony related to the connection, if any, between Steven’s ingestion of cocaine and his suicidal ideation leading to his death. Based upon his educational and professional background and his review of the evidence, Dr. Whaley opined essentially that without specific information related to the time Steven used cocaine, his route of ingestion, the amount used, and its purity, it is scientifically impossible to determine cocaine’s effect on Steven’s mental state at the time of his death.
Dr. Whaley detailed his qualifications as follows. Dr. Whaley is a graduate of Johns Hopkins University and Tufts University Medical School. After graduation, he completed a substance abuse treatment residency in the Alcohol Abuse Unit at Boston State Hospital as well as a psychiatry residency. He has served as a psychiatric consultant at Norwood Hospital, as chair of its Psychiatry Department, and has maintained an outpatient psychiatry practice at the Western Lodge and at the Chatham Hospitals. Additionally, Dr. Whaley gained forensic psychiatric experience at Bridgewater State Hospital in both the civil and criminal context. He is also a member of the American Psychological Association and the Massachusetts Medical Society. Presently, Dr. Whaley maintains an eighty-to-ninety patient per week practice treating individuals suffering from depression and alcohol/substance abuse ailments.
Based on this educational and professional experience, his review of case-specific information,[6] and the Diagnostic and Statistic Manual of Mental Disorders III-R, (DSM III-R) Dr. Whaley concluded that insufficient information exists to determine the effect of Steven’s cocaine use on his mental state. According to Dr. Whaley, the necessary information that was lacking included: (1) the time Steven used cocaine, (2) his method of use, (3) the amount used, and (4) the purity of the cocaine used.
Despite this lack of information, Dr. Whaley was able to conclude that Steven did not likely suffer from cocaine withdrawal at the time of his death. Dr. Whaley explained that a cocaine withdrawal diagnosis usually requires evidence of the following symptoms: pattern of sustained cocaine use followed by cessation and withdrawal, profound dysporia, deep sleep, mood changes, cocaine urges and desire, with perhaps behavior to seek it. Additionally, Dr. Whaley testified that Steven did not demonstrate vulnerability for “crashing” or dysporia. In forming both opinions, Dr. Whaley referenced Steven’s past behavior during his prior cocaine use. He also asserted that not all individuals who use cocaine experience a “crash” or dysporia and noted that one dose of cocaine would not ordinarily lead to suicidal ideation.
During cross-examination, Dr. Whaley acknowledged that suicide is a major complication from reduc *91 tion in cocaine use. He explained further that heavy prolonged sleep (hypersomnia) is a symptom of both cocaine withdrawal and TMZ overdose. Additionally, he expressed disagreement with the contention that all cocaine users suffer from suicidal ideation, hut acknowledged that depression may result from low doses of cocaine. Moreover, he agreed that Steven exhibited symptoms associated with cocaine-induced conditions and other disorders.
Based on these facts and with due consideration to the parties’ submissions and the applicable law, this Court makes the following conclusions of law, rulings and orders.
2. Defendant’s Experts
A. Dr. Bernard Levy
To establish the causal link between Steven’s cocaine use and his suicide, the defendant presented Bernard Levy, M.D. as an expert witness. His testimony addressed his educational and professional background, his opinion regarding the cause of Steven’s suicide, and the basis for that opinion.
Dr. Levy explained his qualifications as follows. He graduated from the Massachusetts Institute of Technology and the Duke University School of Medicine. He then served as an Intern and Assistant Resident in Medicine at the Duke Hospital, as a Psychiatric Resident at the Johns Hopkins Hospital, and as a Clinical Associate with the Laboratory of Clinical Science at the National Institutes of Health. He has also received certification in psychiatry and licenses from the state of Maryland and North Carolina. The recipient of numerous academic appointments, Dr. Levy has also taught psychiatry at the Johns Hopkins School of Medicine and at Harvard Medical School. He has also received hospital appointments as a psychiatrist at the John Hopkins Hospital, the Massachusetts General Hospital, and the Newton Wellesley Hospital.
In addition, Dr. Levy has held advisory board positions with the Gateway Psychiatric Halfway House in Boston and with the Martha’s Vineyard Hospital. He has served as a psychiatry consultant and authored numerous peer review articles. Now in private practice, Dr. Levy treats patients suffering from major depression and chemical dependency.
Relying on this educational and professional experience, his review of Stephen’s medical records, Steven’s toxicology report, the police report, the depositions of Steven’s brother, girlfriend, and parents, as well as scientific literature.[7] Dr. Levy concluded to a reasonable degree of scientific certainty that Steven used cocaine within three days of his death and that this cocaine use constituted a substantial cause of Steven’s suicide. Dr. Levy reasoned that given Steven’s high BE level of 65 ug/dl, Steven took a high cocaine dose just prior to his death. He explained that higher cocaine dosage amounts may create an increased feeling of suicide ideality as higher suicide rates are attributed to higher cocaine doses.
Additionally, Dr. Levy explained that Steven’s depression placed him at an even greater risk for suicide ideality given the generally accepted link between depression and increased suicide. He also noted that Steven’s cocaine use would have produced feelings of despair, regardless of whether the use occurred three days or twelve hours before his death. He further explained that depression is common among both novice and chronic cocaine users.
Dr. Levy also testified that he did not read the defendant’s other expert’s (Dr. Pape’s) assessment of Steven’s case and that his opinion rests on grounds independent of those findings. Dr. Levy noted that he is not qualified as a toxicologist and is unfamiliar with the BE redistribution process.
B. Dr. Brian Pape
To establish the approximate time and cocaine dose Steven ingested just prior to his death, the defendant presented Brian Pape, Ph.D., a toxicologist, as an expert witness. Dr. Pape’s testimony described his educational and professional background, his expert opinion as to Steven’s cocaine use, along with the basis of his opinion.
Dr. Pape detailed his extensive background as follows. He is a graduate of Washington University and Michigan State University with a M.S. and a Ph.D. degree. Following graduation, Dr. Pape worked as an Associate Professor of Pathology and as a Director of Toxicology at the University of Missouri School of Medicine. He then assumed a Senior Associate Consultant position with the Mayo Clinic and an Associate Professor of Pathology position at the University of Massachusetts School of Medicine. He has also served as Director of Toxicology at New England Toxicology Services.
In addition, Dr. Pape is board-certified by both the American College of Forensic Examiners and the American Board of Forensic Medicine. He is the author of numerous published articles related to general toxicology, forensic science, analytical chemistry, pesticides, toxic chemicals and alcohol. Many of his articles in the toxicology field have been subject to peer review. He has been qualified as an expert witness in toxicology and related sciences by state, district and superior courts as well as by the federal courts. Presently, Dr. Pape works with Pape & Associates as a consultant specializing in toxicology and related sciences.
Based on this educational and professional experience, his review of Steven’s medical records, the toxicology report, the police report, and the depositions of Steven’s brother-in-law, Dr. Pape concluded to a reasonable degree of scientific certainty that Steven used multiple doses of cocaine during the three days prior to his death, with Steven’s last use occurring within twelve hours of his death. Dr. Pape applied a “half-life”[8] mathematical formula utilizing a toxicological *92 and pharmacological methodology to arrive at his opinion. He testified that this methodology involves the absorption and distribution of drug elimination and decomposition. He explained that the methodology is generally accepted within the pharmacology and toxicokinetic fields. It has been the subject of peer review and has been utilized by the Food & Drug Administration, the National Institute of Drug Abuse, and by independent scientists.
Through the use of several diagram exhibits, Dr. Pape illustrated this methodology. In the process, he utilized a half-life mathematical formula and Steven’s BE level of 65 ug/dl to establish reasonable ranges as to the time and amount of cocaine Steven used just prior to his death. After conducting his calculations and review of case-specific information (as noted above), Dr. Pape opined that Steven smoked multiple — approximately sixty — doses of cocaine amounting to a total “binge" of three grams of cocaine within twelve hours of his death. Dr. Pape concluded that Steven likely smoked cocaine (as opposed to other methods of cocaine use) because a review of various depositions and Steven’s records indicated that Steven had used this method in the past. In another scenario based on the assumption that Steven “snorted” cocaine, Dr. Pape’s mathematical calculations revealed that Steven used multiple doses of cocaine (totaling seven grams) within twelve hours of his death.
In reaching his opinions, Dr. Pape’s mathematical formula relied on various pharmacological and toxicological principles. These included the following:
1. that the absence of cocaine in the blood is not a reliable indication that no cocaine was used because decomposition could have contributed to its partial or complete disappearance;
2. that the loss of cocaine in the blood can be traced by using the individual’s BE level and by applying the decomposition and absorption principles;
3. that temperature of the blood affects the decomposition rate of BE (Dr. Pape referenced a recent study that demonstrated that at four degrees Celsius, complete substance decomposition would occur after twenty-one days);[9]
4. that while an individual is alive, the elimination half-life for BE is about four to four and a half hours; and
5. that absorption and redistribution of cocaine occur at different times depending upon whether the route of administration is nasal insophalation (“snorting”), smoking, or injection.
Additionally, Dr. Pape noted that the BE level of 65 ug/dl four months after Steven’s death indicated the minimum amount of cocaine Steven consumed prior to his death. He explained that various dose and elimination studies show that because decomposition contributes to the disappearance of BE in the blood both before and after death and also while blood is stored, a BE level may not truly reflect the individual’s BE level as of the time of death.
In arriving at his opinions, Dr. Pape’s mathematical calculations excluded several alternatives. Dr. Pape excluded the possibility that Steven used one dose of cocaine because he believed that Steven’s high BE level would be inconsistent with one dose. As he explained, one dose in the corresponding amount of cocaine would likely have been immediately fatal to Steven. Multiple doses of cocaine consumed at different times, therefore, more likely account for Steven’s high BE level. Additionally, Dr. Pape excluded the possibility that Steven used cocaine intravenously. He reasoned that such use was unlikely because the autopsy report revealed no injection sites on Steven’s body.
During cross-examination, Dr. Pape responded to the plaintiffs challenges to the factual information utilized in his mathematical calculations. He clarified that in a prior case, he could not apply the same methodology because that case lacked the necessary information. He distinguished the two cases and stated that the information lacking in his previous case was not lacking in Steven’s case. In addition, Dr. Pape responded to questions regarding his qualifications and professional background.
DISCUSSION
I. The Plaintiffs’ Motion in Limine to Exclude Any Reference to Cocaine and to Bar Any “Expert” Testimony Related to Cocaine
In this motion in limine, the plaintiffs contend that any references to cocaine should be excluded at trial because the defendant cannot establish a causal link between Steven’s cocaine use and his suicide. The plaintiffs assert that any references to cocaine would therefore be both irrelevant and unduly prejudicial. More specifically, the plaintiffs argue that insufficient information regarding the time of Steven’s cocaine use, the cocaine amount, its purity, and the route of its administration makes it scientifically impossible to determine whether Steven’s cocaine use influenced his decision to commit suicide. The defendant, on the other hand, contends that its expert testimony sufficiently establishes a causal connection between Steven’s cocaine use and his suicide. Further, the defendant maintains that his experts’ testimony satisfies the admissibility standard enunciated in both Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and in Commonwealth v. Lanigan, 419 Mass. 15 (1994). After extensive review of these contentions, this Court concludes that the evidence presented by the defendant’s experts satisfy the admissibility tests set forth in Daubert and in Lanigan.[10]
With its seminal decision in Daubert, the Supreme Court expanded the scope of admissible scientific expert opinion to conform to the liberal notions embodied in Rule 702[11] of the Federal Rules of Evidence. 509 U.S. at 588.[12] Rather than requiring “general acceptance” for admissibility, the Daubert Court required a showing of the expert opinion’s relevancy and evidentiary reliability. *93 See supra at 589. Factors the court may consider in making this determination include the following: (1) whether the theory or technique underlying the opinion is generally accepted in the relevant scientific community; (2) whether it can be and has been tested, and the outcome of any testing; (3) its error rate, and the existence of any controls or standardization; and (4) whether it has been subjected to peer review and publication. Daubert, supra at 592-594.[13] No single factor is dispos-itive. See Id.[14]
Additionally, Daubert does not require that a party who proffers expert testimony establish that the expert’s opinion is accurate. Ruiz-Troche v. Pepsi-Cola of Puerto Rico, 161 F.3d 77, 81 (1st Cir. 1998). Rather, Daubert only requires that an expert’s scientific testimony rests upon “good grounds, based on what is known.” Supra at 590 (internal quotation marks omitted). The Daubert court emphasized that courts should not exclude the opinion from the jury because of “fear that they will not grasp its complexities or satisfactorily weigh its inadequacies,” but allow “the adversary process — competing expert testimony and active cross-examination” to test it. Id. at 596. A party need only demonstrate that the expert’s opinion was developed “in a scientifically sound and methodologically reliable fashion.” Id. (omitting citations).
In Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994), the Supreme Judicial Court adopted the Daubert rule and reasoning on the admissibility of scientific expert opinion. The Lanigan court recognized that the trial court must assess the reliability and relevance of scientific evidence by functioning as the “gatekeeper.” Id. It held that a party seeking to introduce scientific evidence may establish “the reliability or validity of the underlying scientific theory or process by some other means, that is, without establishing general acceptance.” Id. As the Lanigan court explained, the reliability requirement is “implicit in rule 702, which on its face uses helpfulness to the trier of fact as the test of admissibility of expert testimony based on scientific knowledge.” Id. at 25. If the jury can examine an expert’s testimony using common sense and experience and can comprehend the underlying methods or theories of the testimony, then “the expert’s qualifications and the logical basis of the testimony can be effectively tested through cross-examination and rebuttal evidence.” Commonwealth v. Sands, 424 Mass. 184 (1997) (reaffirming Lanigan).
Applying these principles in a case analogous to the instant case, Ruiz-Troche v. Pepsi-Cola of Puerto Rico, 161 F.3d 77 (1st Cir. 1998), the First Circuit held that the trial court had abused its discretion because it had imposed standards more stringent than those found in Daubert, supra at 81. In Ruiz, the trial court excluded the defendant’s testimony of a well-credentialed pharmacologist regarding the significance of a toxicology report’s findings of cocaine and benzoylecgonine in a deceased’s blood. More specifically, the expert had been prepared to testify (1) that the deceased had snorted 200 milligrams of cocaine within an hour of the fatal accident; and (2) that cocaine impairs senses and abilities affecting driving, decreases perception, and increases risk-taking. Id. at 81. The plaintiffs had contended that the cocaine and metabolite levels in the bloodstream could not be correlated to an initial cocaine dosage or impairment level with the requisite reasonable degree of scientific certainty. Id.
In reversing the trial court’s ruling, the First Circuit held that the expert’s testimony derived from a reliable methodology sufficient to satisfy Daubert. Id. The court recognized that the lower court had improperly required “that science be able to declare that a precise quantity of cocaine in the bloodstream produces an equally precise degree of impairment.” Id. at 86. The lower court had sought “a level assurance that science realistically cannot achieve and that Daubert does not demand.” Id. Here, in the instant case, the plaintiffs make a similar demand of science.
A. The Reliability Requirement
1. The Challenge to Dr. Levy’s Testimony
The plaintiffs here seek a level of assurance that Daubert does not require. Unlike Ruiz, however, here there exists no dispute regarding the fact that Steven used cocaine within three days prior to his death. The dispute here, rather, centers on whether the scientific evidence can reasonably link Steven’s cocaine use as a factor in his suicide. More specifically, the plaintiffs assert that Dr. Levy’s testimony failed Dauberts reliability test because science cannot draw a causal link between Steven’s cocaine use and his suicide without hard information regarding the amount used, the exact time of use, and the method of use. In the plaintiffs’view, only this information can provide sufficiently reliable evidence as to whether Steven’s cocaine use within three days of his death impacted his decision to commit suicide. To adopt the plaintiffs’ position, however, would impose a standard of scientific certainty beyond that required by Daubert. See Ruiz, supra at 86.
Daubert does not require science to be able to declare the precise quantity of cocaine used, the precise method used, and the precise time of use before concluding that Steven’s cocaine use is causally related to his suicide. Cf. id. (recognizing that Daubert does not require “science [to] be able to declare that a precise quantify of cocaine in the bloodstream produces an equally precise degree of impairment”). Moreover, Daubert does not require the defendant to prove that Dr. Levy is precisely correct. See Ruiz, supra at 86. Rather, Dr. Levy’s opinion regarding the causal link need only rest on “good grounds, based on what is known.” Daubert, 509 U.S. at 590 (internal quotation marks omitted). This burden the defendant meets.
Dr. Levy’s opinion rests on “good grounds.” See supra at 590. Dr. Levy based his opinion on extensive educational and professional experience in psychiatry, on his review of Stephen’s medical records, various deposition *94 testimony, the toxicology report’s BE level of 65 ug/dl and scientific literature. He reasoned that given Steven’s high BE level of 65 ug/dl, Steven took a high cocaine dose just prior to his death. He explained further that higher cocaine dosage amounts may create increased suicide ideality because higher suicide rates have been attributed to higher cocaine doses.
Moreover, each of the articles referenced by Dr. Levy support his assertion that cocaine use increases the risk of suicide.[15] The scientific literature also supports his assertion that Steven’s depression placed him at an even greater risk for suicide ideality given the generally accepted link between depression and increased suicide.[16] Publication of these studies and their exposure to peer review by themselves qualify as “independent indicia of the reliability” of Dr. Levy’s assessment. See Ruiz, supra at 84. At the same time, publication and peer review also establish a degree of acceptance within the scientific community of Dr. Levy’s reasoning and opinion. See id.
While the plaintiffs’ experts may cast doubt on Dr. Levy’s opinion, they do not establish the opinion’s unreliability. See Daubert, 509 U.S. at 592-95 (recognizing that not one single factor disposes of a reliability inquiry). Dr. Levy’s position has endured the rigorous examination of publication and peer review, and it appears to have received acceptance within the scientific community. See Ruiz, supra at 84. As for the opposing opinions offered by the plaintiffs’ experts, they do not preclude admissibility of Dr. Levy’s opinion. Accordingly, this Court concludes that Dr. Levy’s testimony sufficiently satisfies the requirements of Daubert and Lanigan.
2. The Challenge to Dr. Pape’s Testimony
In addition, this Court concludes that Dr. Pape’s testimony concerning the approximate time of Steven’s cocaine consumption and the approximate amount of cocaine he used meets the Daubert and Lanigan admissibility thresholds. The plaintiffs assert that Dr. Pape’s opinion is unreliable because of insufficient data. The plaintiffs contend that Dr. Pape’s conclusion that Steven last consumed cocaine by smoking twelve hours prior to his death cannot be determined from the BE level alone.
Dr. Pape, however, bases his opinion on much more than the toxicology report’s BE level. His opinion involves the application of toxicokinetic and phar-mokinetic principles, consideration of information contained in the police report indicating that Steven had been sleeping for extended periods of time just prior to his death, review of Steven’s brother-in-law’s deposition testimony describing changes in Steven’s appearance, demeanor, and behavior, and consideration of Steven’s past use of cocaine by smoking. Relying on this information and BE’s half-life value, Dr. Pape employed a mathematical formula to conclude with a “reasonable degree of scientific certainty” that Steven smoked 50 mg of cocaine twelve hours prior to his death. Through testimony and various diagrams, Dr. Pape explained that given Steven’s high BE level, Steven most likely smoked about 60 doses of 50 milligrams each of cocaine amounting to a total cocaine “binge” of 3 grams of cocaine.
Given this methodology and reasoning, the plaintiffs’ claim of insufficient information is unwarranted. The defendant has sufficiently established that Dr. Pape’s opinion developed “in a scientifically sound and methodologically reliable fashion.” See Daubert, supra at 590 (omitting citations). As for the plaintiffs’ reliance on Hicks v. Brox Industries, Inc., 47 Mass.App.Ct. 103 (1999), it is misplaced. In Hicks, the court rejected the proffered testimony of a mechanical engineer as unreliable expert testimony because the engineer had utilized “methods of the vaguest description using ill described computer models.” Id. at 107. In addition, the engineer failed to describe “(t]he origin, source, prior use, testing, general acceptance and foundation of and for the models . . .” Id. Here, unlike in Hicks, the expert, Dr. Pape, utilized clearly defined methods and models to illustrate the basis of his opinion. Dr. Pape’s opinion as to Steven’s cocaine dosage and time of dosage is supported by a reliable methodology based on toxicokinectic and pharmacological principles related to the absorption and distribution of drug elimination and decomposition.
As Dr. Pape explained, the methodology has been generally accepted in the pharmacology and tox-icokmetic fields and has been subject to peer review. It is utilized by the Food & Drug Administration (“FDA”), independent scientists, and by the National Institute of Drug Abuse. Moreover, the plaintiffs’ own expert, Dr. vonMoltke, does not dispute the general reliability of the methodology to establish various scenarios in which Steven used cocaine during the three days prior to his death. The methodology, therefore,. constitutes “good grounds, based on what is known.” See Daubert, supra at 590. The essence of the plaintiffs’ objection to Dr. Pape’s opinion is not so much the methodology used but the inferences and conclusions drawn therefrom.
In addition, Dr. Pape’s expert testimony is “valid through other means.” See Sands, 424 Mass. at 185-86. Dr. Pape’s methodically articulated and diagrammed presentation will enable jurors to understand the methods and theories underlying his opinion, and allow them to evaluate his testimony using their common sense and experience. See id. As for the opinions offered by plaintiffs’ experts, the plaintiffs can utilize them to test Dr. Pape’s qualifications and the logical basis of his inferences and conclusions through cross-examination and rebuttal evidence. Id. As with Dr. Levy’s testimony, the opinions of the plaintiffs’ experts do not provide the basis to preclude admissibility.
Accordingly, this Court concludes that Dr. Pape’s testimony satisfies the Daubert and Lanigan standard for admissibility.
*95 B. The Relevancy Requirement
This Court now turns to the relevancy requirement of the defendant’s expert testimony. In addition to the reliability prerequisite, both Daubert and Lanigan require that a party proffering scientific expert testimony also establish the evidence’s relevancy. See Daubert, supra at 591-592; Lanigan, supra at 26. As the Supreme Court has explained, to be admissible, expert testimony must be “relevant” not only in the sense that all evidence must be relevant, but also “in the incremental sense” that the expert’s proffered testimony once admitted would likely “assist the trier of fact to understand or determine a fact in issue.” See Daubert, 509 U.S. at 591-92. The party must demonstrate “a valid scientific connection to the pertinent inquiry as a precondition to admissibility.” Id. at 592. The defendant has met this burden.
Applying these principles and given this Court’s analysis under the reliability requirement, this Court concludes that the evidence related to cocaine, including evidence of Steven’s present and past use as well as the proffered expert testimony, is unquestionably relevant here. Both Dr. Pape’s and Dr. Levy’s testimony, based on valid and reliable scientific grounds, address the issue of whether Steven’s use of cocaine contributed to his death by suicide. Their evidence directly relates to and is relevant in determining whether the defendant’s negligence was a substantial contributing cause of the defendant’s suicide. Moreover, this direct relationship to causation establishes that the evidence’s highly probative value substantially outweighs any prejudice to the defendant. See Commonwealth v. Berry, 47 Mass.App.Ct. 24 (1999); Commonwealth v. Booker, 386 Mass. 466, 469-470 (1982). Accordingly, this Court deems the defendant’s expert evidence and any other evidence related to cocaine admissible.
II. The Plaintiffs’ Motion in Limine to Exclude Any Testimony from Brian Pape, Ph.D. for Which There Has Been No Adequate Disclosure and to Exclude Any Testimony With Respect to Temazepam/Oxazepa Redistribution and Ratios
In this motion, the plaintiffs contend that the defendant has failed to demonstrate the reliability of its expert’s, Dr. Pape’s, opinion as to TMZ/OXZ redistribution and ratios. Additionally, the plaintiffs assert that the defendant failed to comply with Rule 26’s requirement of providing adequate disclosure for Dr. Pape’s expert testimony. For the reasons set forth below, the plaintiffs’ motion is DENIED.
A. The Reliability of Dr. Pape’s Proffered Opinion as to TMZ/OXZ Redistribution and Ratios
While the plaintiffs’ expert challenged the reliability of Dr. Pape’s proffered opinion regarding TMZ/OXZ redistribution and ratios, Dr. Pape never offered any opinion specific to TMZ/OXZ redistribution and ratios during his testimony. Rather, his testimony centered exclusively on his opinion and methodology used to determine the time and amount of cocaine Steven ingested prior to his death. Utilizing accepted toxicological and pharmacological methodologies, involving the absorption and distribution of drug elimination and decomposition, Dr. Pape rendered an opinion regarding the dosage of cocaine used by the decedent as well as the probable time of ingestion. Since Dr. Pape appeared not to have relied upon TMZ/OXZ redistribution and ratios, the issue presented in plaintiffs’ Motion in Limine is moot as it applies to the Daubert hearing. Second, Dr. Pape laid a sufficient foundation of expertise and accepted toxicological and pharmacological methodologies to have rendered an opinion regarding TMZ/OXZ redistribution and ratios.
Accordingly, this Court DENIES the plaintiffs’ motion in limine to exclude Dr. Pape’s proffered opinion as to TMZ/OXZ redistribution and ratios.
B. The Defendant’s Rule 26 Compliance
The plaintiffs also assert that the defendant has failed to comply with the expert disclosure requirements of Rule 26. In particular, the plaintiffs contend that the defendant has not disclosed in detail the factual and scientific aspects of Dr. Pape’s expert testimony.[17]
This Court has broad discretion in determining whether the defendant complied with Rule 26. See Elias v. Suran, 35 Mass.App.Ct. 7, 10 (1993), citing 8 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE §2050 (1970) (recognizing that a trial judge has “broad discretion” in determining whether a part has provided proper disclosure of the subject matter of an expert’s anticipated testimony). Here, the plaintiffs fail to recognize that Rule 26 does not require such a high level specificity for expert disclosures. In pertinent part, Rule 26 provides:
a party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.
(Emphasis added.) The defendant has met each of these requirements.
In the defendant’s Supplemental Answers to Plaintiffs’ First Set of Interrogatories, dated December 17, 1998, the defendant identified Dr. Pape as one of his expert witnesses, stated the subject matter of his testimony, and sufficiently described “the substance of the facts and opinions” contained in his expert testimony. Supra at 6-7. The plaintiffs’ own memorandum contains excerpts that attest to the defendant’s compliance. Moreover, the defendant adequately described the bases for Dr. Pape’s opinions as his “education, training and experience,” “Steven Holtje’s medical records, autopsy report, toxicology reports, and pertinent discovery, including deposi *96 tions, which have been generated in this case.” See Defendant, William E. Waterman, M.D.’s Supplemental Answers to Plaintiffs’ First Set of Interrogatories at 7. Lacking here is the type of unfair surprise that Rule 26 seeks to prevent. See Resendes v. Boston Edison, 38 Mass.App.Ct. 344, 351 (1995).
Accordingly, this Court concludes that the defendant properly complied with the disclosure requirements of Rule 26.

ORDER

For the foregoing reasons, this Court hereby ORDERS the following:
1. that the plaintiffs’ Motion in Limine to Exclude Any Reference to Cocaine and to Bar Any “Expert” Testimony Related to Cocaine is DENIED;
2. that the plaintiffs’ Motion in Limine to Exclude Any Testimony from Brian Pape, Ph.D. for Which There Has Been No Adequate Disclosure and to Exclude Any Testimony With Respect to Temazepam / Ox-azepam Redistribution and Ratios is DENIED.

This Court addresses both motions here because both were the subject of a so called Daubert hearing held in September 1999. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Commonwealth v. Lanigan, 419 Mass. 15 (1994), discussed infra.

BE is a metabolite of cocaine. A metabolite of a particular drug does not qualify as the drug itself, but is rather the chemical derivative of the drug manufactured by the body as it metabolizes the substance.

The reliability of the testing instruments utilized to reach these toxicology results are not in dispute. Experts for both parties agree that these testing instruments used here, the gas chromatogram/mass spectrometry (“GC-MS”), and radio immunoassay ("RIA”) are rehable. These techniques are commonly used by officials associated with the Olympics, professional sports, legal proceedings, and the FDA.

Specifically, Dr. vonMoltke referenced the study completed by a Dr. Logan and published in the Journal of Analytical Toxicology in 1997. The study was entitled, “Lack of Predictable Site-Dependent Differences and Time-Dependent Changes in Postmortem Concentrations of Cocaine, Benzolyecgonine, and Cocaethylene in Humans.”

TMZ is a sedative and anti-anxiety medication.

In arriving at his opinions, Dr. Whaley relied upon the following records: (1) Steven’s medical records from the Wal-tham/Weston Center; (2) the defendant’s psychiatric records pertaining to Steven; (3) Steven’s general physician’s report; (3) Steven’s Newton Wellesley Hospital records; (4) interrogatories; (5) depositions from Steven’s parents, Peter and Marcelline G. Holtje, the defendant; and from his girlfriend, Meridith Sousa; and (6) psychological literature on cocaine and its impact on an individual's mental state.

This scientific literature included the following: Prevalence of Cocaine Use Among Residents of New York City Who Committed Suicide During a One-Year Period, Marzuk, Peter, et al., AMERICAN JOURNAL OF PSYCHIATRY, 149:3, March 1992 (use of cocaine enhances suicide risk); Abstinence Symptomatology and Psychiatric Diagnosis in Cocaine Abusers, Kleber, Herbert, et al., ARCHIVES OF GENERAL PSYCHIATRY, vol. 43, Feb. 1986 (study revealed that after subjects ended their cocaine binge, a large percentage experienced “temporary suicidal ideation”).

Dr. Pape defined a “half-life” as the amount of time in hours when one-half of a substance's quantity in the body will be naturally eliminated through metabolic processes.

This factor has some significance in this case since Steven’s blood had been stored at 4 degrees Celsius for well over 90 days before it was tested.

This Court notes that given their extensive educational and professional experience with the subject matter of their testimony, all four witnesses qualified as experts. See Louise Caroline Nursing Home, Inc. v. Dix Constr. Corp., 362 Mass. 306, 309 (1972) (recognizing that a trial judge has broad discretion in determining the qualifications of a witness to testify as an expert); Gill v. North Shore Radiological Association, 10 Mass.App.Ct. 885, 886 (1980) rev’d on other grounds 385 Mass. 180 (1982) (requiring expert witnesses to possess sufficient “education, training, experience and familiarity” with the subject matter of their testimony).

Rule 702 of the Federal Rules of Evidence provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

For many years, the Frye standard governed the admissibility of scientific expert opinion. See Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Under Frye, scientific expert opinion was restricted to expert testimony based on scientific techniques considered “ ‘generally accepted’ as rehable by the relevant scientific community.” Daubert, supra at 584.

Recently, the Supreme Court in Kumho Tire Co., Ltd. v. Carmichael, 119 S.Ct. 1167, 1174 (1999), clarified that the Daubert rule extends to all expert opinion evidence, including not only opinions based on specialized training and experience, but also those based on scientific knowledge.

In their most recent reexamination of Daubert, the Supreme Court recommended that application of these factors requires flexibility and direct reference to the facts of the case, including the expert’s particular expertise, the subject of the expert's testimony, and the nature of the issue under consideration. Kumho, supra at 1175.

See Prevalence of Cocaine Use Among Residents of New York City Who Committed Suicide During a One-Year Period, Marzuk, Peter, et al., AMERICAN JOURNAL OF PSYCHIATRY, 149:3, March 1992 (use of cocaine enhances suicide risk); Abstinence Symptomatolgy and Psychiatric Diagnosis in Cocaine Abusers, Kleber, Herbert, et al., ARCHIVES OF GENERAL PSYCHIATRY, vol. 43, Feb. 1986 (study revealed that after subjects ended their cocaine binge, a large percentage experienced “temporary suicidal ideation”). Other literature also supports his assertions. See, e.g. Suicide Attempts in Major Affective Disorder Patients with Comorbid Substance Use Disorders, JOURNAL OF CLINICAL PSYCHIATRY 63 (1999) (recognizing the “broad consensus that substance use disorders strongly increase risk of suicidal behavior, particularly in patients with major mood disorders”); SUBSTANCE ABUSE: A COMPREHENSIVE TEXTBOOK, ed. Lowinson and Ruiz, et al., Williams & Wilkins (1999).

See, e.g. Suicide Attempts in Major Affective Disorder Patients with Comorbid Substance Use Disorders, JOURNAL OF CLINICAL PSYCHIATRY 63 (1999) (recognizing the “broad consensus that substance use disorders strongly increase risk of suicidal behavior, particularly in patients with major mood disorders").

This Court previously rejected this argument when it denied the plaintiffs’ earlier Motion for Order for Defendant’s Position at Daubert Hearing.